UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL COX, | No. 2:13-cv-02356-JAM-GGH |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| RONALD J. RACKLEY, | |
| Respondent. | |

I.  INTRODUCTION AND SUMMARY

    Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is serving a thirteen-year prison term based on a 2011 plea agreement wherein petitioner pled guilty to transporting marijuana, transporting methamphetamine, being a felon in possession of ammunition, driving under the influence of alcohol or drugs, and the unlawful taking or driving of a vehicle as well as admitting to sentencing enhancements which included being out on bail when he committed the offenses and that he had a prior strike for first-degree burglary in August 2004. Petitioner challenges his sentence on the grounds that the 2004 burglary conviction—which was the result of a plea agreement—was constitutionally invalid. In particular, petitioner contends: 1) he is actually innocent; 2) he received ineffective assistance of counsel because trial counsel refused to offer evidence of his innocence, failed to investigate potential defenses, and gave erroneous advice; 3)

1

his due process rights were violated when the court refused to dismiss petitioner's prior strike, denying petitioner's Romero motion in his 2011 case; and 4) he was denied a fair trial because the trial court judge and the prosecutor committed misconduct.

Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

II.   BACKGROUND

A.   2004 Conviction

Pursuant to a stipulation, petitioner and the State agreed that the police report would serve as the factual basis for the entry of the plea. ECF No. 29-12 at 26. That police report, prepared by Sheriff's Deputy Dean, described the incident as follows:

> On 04-01-2004, at approximately 0041 hours, I was dispatched to a suspicious circumstance, which was occurring at 4448 Pensacola Street in Shasta Lake City. Dispatch also said an unknown female was heard screaming for help[.]
>
> Upon my arrival, I contacted the victim and she identified herself as Collette Cook[.] Collette had fresh blood on her face and an approximate one-inch vertical laceration to the center of her forehead[.] The laceration was still bleeding when I arrived[.] The area surrounding the laceration was black/blue in color, and swollen[.] Collette also had an approximate one-inch vertical laceration to her lower shin are of her left leg. The laceration had fresh blood coming from it and the area surrounding it appeared to be swollen[.] The area was black and blue in color. I had medical respond and treat Collette for her injuries. Collette was treated at the scene and was later taken to Redding Medical Center for further treatment. I later contacted Collette and she told me the laceration to her forehead required eight stitches and the one to her shin required four stitches.
>
> A friend, who was also at the scene, accompanied Collette and she identified him as Christopher Benson. Collette said Christopher was present and witnessed the incident.
>
> I asked Collette what happened and this is her statement in summary:
>
> Collette said at approximately 0030 hours, she and Christopher were seated in the living room of Collette's residence[.] She said the front door was locked and the curtains to the only window in the living room were drawn[.] She heard loud banging on the front door of her residence. Then she heard a voice, she recognized as Daniel Cox, yelling from outside the door[.]
>
> Collette said Daniel is an ex-boyfriend of three years and they share

a one-year-old child together[.]  Collette said Daniel started screaming, "I'm gonna fucking kill yah." Daniel continued to yell he was going to kill Collette and started kicking and pounding on the door even harder[.] Collette was afraid the door would break open, so she placed her hands on it, to keep it from being forced open. Daniel continued to pound on the door and threaten Collette for at least thirty seconds.

Afterwards, Collette said it was momentarily quiet and then she heard the glass of the living room window break[.] She saw the glass fly inward and afterwards, Daniel crawled through the broken window[.] When he entered, she and Christopher retreated to the kitchen, which is adjacent to the living room.

As Daniel entered the house he was holding an axe handle in his right hand. The handle had no blade, was approximately three feet long, and made of wood[.]

Daniel became more irate when he saw Christopher and said, "Is this your new old man." Collette tried to protect Christopher by standing between Daniel and Christopher using herself as a human shield[.] She repeatedly told Daniel to leave but he refused[.]

Collette was in fear of her life and attempted to grab the phone so she could call 911. Daniel grabbed the phone from her and ripped the wire out of the wall, preventing her from calling 911[.]

Daniel then used both hands, with an overhead chopping motion, and swung the axe handle downward, and hit Collette in the forehead[.]  Daniel hit Collette so hard that she "saw stars," momentarily lost consciousness, and fell backwards onto the kitchen floor[.]  While falling backwards, she also knocked Christopher to the kitchen floor[.]

Daniel advanced towards their location until he was standing over them. He hit both Collette and Christopher eight or nine more times with the axe handle[.] They were hit in various portions of their bodies[.] Collette was unsure exactly where else they were hit other than one strike to her shin[.]

While swinging the axe handle, Daniel continued to yell and threaten both Collette and Christopher[.] Daniel did not stop until his one-year-old child; Daniel Cox, Jr came into the living room and started crying. Daniel put down the axe handle and said he was gonna take his son[.]  Collette told him no, and begged him to leave[.]

Meanwhile, Christopher had snuck out of the house undetected and ran to a neighbor's to get help. He contacted a neighbor and asked them [to] dial 911 because the phone at Collette's residence was not working[.]

While Christopher was getting help, Collette screamed as loud as she could for help and begged neighbors to call the police. Daniel exited the kitchen to the porch area of the residence through the

3

living room[.]

Daniel saw Christopher walking back towards the residence and Christopher told him the police were on their way[.] Daniel ran to his truck and drove away[.]

* * *

Collette was in fear for her life because Daniel has a history of violence[.] Based on prior contacts, I knew Daniel was on probation for felony domestic violence. Collette believed Daniel would carry through with his threat to kill her.

While interviewing Collette, Christopher was able to repair the damaged phone line. A short time later, the phone rang and Collette answered. She recognized the voice calling her as Daniel's[.] She told me Daniel was on the phone and handed it to me. I asked the voice on the other end of the connection if he was in fact Daniel Cox[.] The voice said yes[.] I asked Daniel if he would like to speak with me[.] He said yes and told me to meet him at the "Burger King" on the corner of Cascade Blvd and Shasta Dam Blvd[.] I asked Daniel where he was at and he would not tell me. Daniel then hung the phone up[.]

I advised Deputy Nelson Daniel would be meeting him at the Burger King. Deputy Nelson responded to the location but Daniel never showed up[.] I made several attempts to call Daniel back with negative results.

I asked Christopher what happened and this is his statement in summary[.]

Christopher said he and Collette were seated in the living room. He was going to apply a tattoo to Collette's left arm. While sitting there, he heard a loud bang coming from outside the front door to the residence. The banging continued and he heard a voice, who he recognized as Daniel's, scream that he was going to kill Collette[.] The banging on the door increased in intensity and Daniel continued to threaten Collette.

Collette became afraid the door would not keep Daniel out, so she used her body and leaned against the door to keep from being forced open[.] After an unknown amount of time, the banging on the door stopped and it was momentarily quiet[.] Afterwards, the living room window shattered and glass flew inward towards the living room. Both Christopher and Collette ran into the kitchen from the living room[.]

After the window broke, they saw Daniel crawl through the broken window. When he did so, Christopher saw an axe handle in Daniel's right hand. Christopher speculated Daniel used the axe handle to break the window[.]

After entering the residence, Daniel advanced towards Collette and Christopher. Collette stepped between Christopher and Daniel and

4

> asked him to just leave. Daniel became more agitated and asked Collette if Christopher was a boyfriend[.]
>
> Afterwards, Daniel used both hands in an overhand chopping motion and struck Collette in the head with the axe handle[.] The force was sufficient to knock both Collette and Christopher to the floor of the kitchen[.] Afterwards, Daniel used the same overhand chopping motion and hit both Christopher and Collette approximately three to four more times. Christopher said the axe handle hit his back and left wrist during the altercation.
>
> I examined the area[]s where Christopher said he was hit. His lower back and left wrist had redness and minor swelling[.] Christopher declined medical attention, when I offered it.
>
> Daniel stopped the assault after Collette's son walked into the living room and started crying[.] Christopher then grabbed the axe handle away from Daniel. Afterwards, Christopher exited the kitchen, through the back door to the residence, and ran for help at a neighbor's[.] He asked a neighbor to call 911 because his phone was disabled. While at the neighbor's, Christopher could hear Collette screaming for help[.]
>
> After a neighbor told Christopher they would call 911, he returned back to the residence to help Collette[.] As he walked back, he saw Daniel standing on the front porch of the residence. Christopher told Daniel the police were on their way[.] Daniel ran to his truck, "peeled out," and left southbound on Black Canyon Road[.]
>
> * * *
>
> The living room window was broken completely and the glass was strewn about the interior of the residence[.] I knew the window to the residence had been recently broken because it wasn't broken when I responded to a prior incident, earlier in the night (Refer to Log Report # 04-10890)[.] The window looked consistent with being broken from the outside[.]
>
> The axe handle was left at the scene and both Collette and Christopher positively identified as the handle used in the assault. I later booked it into evidence[.]
>
> I examined the door Daniel attempted to force open. There were no footprints on the exterior of the door[.] The area where the "Dead bolt" meets the doorframe looked like it had been damaged but still worked. There was slight splintering to the wood in that area. The damage looked consistent with an outside force attempting to push the door inward[.]

ECF No. 29-12, at 6–10.

Petitioner reached a plea agreement with the prosecution whereby petitioner pled guilty to assault and first degree residential burglary and stipulated to a prison term of five years. ECF No.

29-12, at 17–20, 23. Petitioner subsequently filed a series of state habeas petitions challenging the burglary conviction on the ground of ineffective assistance of counsel, claiming that he was in fact innocent of burglary because he lived at the residence he entered and that documents known to trial counsel would have proven it. The superior court rejected the petition on the merits noting petitioner "neglects to recall that upon his being booked into the Shasta County Jail, he gave authorities a different address than the one he was accused of burglarizing" and that he "also filled out an income qualification statement for the appointment of a Public Defender in which he listed a different address than the one he plead guilty to burglarizing." ECF No. 29 at 3. This same ineffective assistance of counsel claim was denied by California Court of Appeal. ECF No. 29-2, at 54. Petitioner served his sentence and was released on parole in January 2007. ECF No. 29-6 at 47.

     B.     <u>2010 Conviction</u>

*First Case (Case No. 10F5058)*

> On June 30, 2010, following a traffic stop, defendant was found in possession of 436.9 grams of marijuana in five separate baggies and a cell phone containing text messages related to drug sales. Officers also found a digital gram scale in the vehicle in which defendant was traveling.
>
> Defendant was charged with possession of marijuana for sale, transportation of marijuana, being a felon in possession of ammunition, operating a vehicle without a functioning interlock device, driving with a suspended license, and failing to wear a seatbelt. It was further alleged that defendant was twice previously convicted of a serious or violent felony, served a prior term in prison, and committed the current offenses while out on bail or on his own recognizance in other cases.

*Second Case (Case No. 10F5465)*

> On August 3, 2010, defendant was again stopped while driving a vehicle. On this occasion, defendant was stopped because his license plate was obstructed and the registration sticker had expired. After the traffic stop, the officer observed defendant "reaching around within the vehicle," then into a black backpack inside the vehicle. Defendant was asked to "stop digging around" and put his hands where the officer could see them.
>
> Defendant complied with the officer's direction. The officer then told defendant why he had been stopped; defendant told the officer the vehicle did not belong to him, but he was in the process of buying it. Defendant admitted he did not have his driver's license

with him and that it was, in fact, suspended or revoked.

Defendant consented to a search of the vehicle, saying the backpack inside the vehicle was his. Inside the backpack, were a Ziploc baggie containing 14.4 grams of methamphetamine, a hypodermic needle, a digital scale, and three rounds of .25–caliber full-metal-jacket ammunition. A further search of the vehicle uncovered a glass smoking pipe on the passenger's seat. Defendant's passenger admitted the pipe was his.

Following a series of questions regarding the items found in the vehicle, a field sobriety test was performed on defendant and it was determined he was under the influence of a controlled substance. Defendant and his passenger were both arrested.

Defendant was subsequently charged with possession of methamphetamine, possession of methamphetamine for sale, transportation of methamphetamine, being under the influence of a controlled substance, being a felon in possession of ammunition, driving under the influence of alcohol or drugs, driving with a suspended license, carrying a loaded firearm on one's person in a city, and being a felon in possession of a firearm.

It was further alleged that defendant was personally armed with a firearm during the commission of these crimes, was twice previously convicted of a serious or violent felony, was personally armed with a firearm during the commission of a crime related to controlled substances, was out on bail or his own recognizance when he committed the offenses, and previously served a term in prison.

*Third Case (Case No. 10F6764)*

On August 3, 2010, Billy Russell went to the Redding Police Department to report his 1988 Ford Bronco stolen. Russell did not, however, have the license plate or vehicle identification number for the vehicle. Russell told officers he was in the process of registering the vehicle in his name and did not have the paperwork. He was told to get the necessary information and return to the department.

Russell returned to the police department two days later with the appropriate information for the vehicle. Russell explained that early in the morning on August 2, 2010, he parked the Bronco in front of a motel intending to return and pick it up with a trailer because the vehicle had not yet been "smogged" and was not yet registered. When he returned later that day, the Bronco was gone.

Officers checked the registration for the Bronco and learned it was impounded on August 3, 2010, after defendant was arrested on numerous narcotics charges in the second case. Russell denied knowing defendant or the passenger with whom defendant was arrested, and he did not give either of them permission to drive his Bronco.

Defendant was later charged with the unlawful driving or taking of

7

a vehicle. It was further alleged that defendant was twice previously convicted of a serious or violent felony, served a prior term in prison, and committed the offense while out on bail or his own recognizance.

*Plea*

On August 5, 2011, defendant agreed to resolve all pending cases. He pled guilty to transporting marijuana, transporting methamphetamine, being a felon in possession of ammunition, driving under the influence of alcohol or drugs, and the unlawful taking or driving of a vehicle. Defendant also admitted being previously convicted of a serious or violent felony, committing offenses while out on bail or his own recognizance, and previously serving a term in prison.

In exchange for his plea, the People agreed to dismiss the remaining charges and allegations as well as five pending but unrelated criminal cases and terminating defendant's probation in Shasta County case No. 08CTR182. The agreement preserved defendant's right to file a Romero motion; provided he would not receive probation; and provided for a 15–year–8–month lid on defendant's sentence.

*Romero Motion*

After entering his plea, defendant filed a Romero motion asking the court to strike his prior conviction for burglary. In support of his motion, defendant offered numerous letters from family members and friends, as well as various educational and self-improvement certificates defendant earned while incarcerated in the county jail. At the hearing on defendant's motion, the court also heard from several witnesses speaking on defendant's behalf, including defendant's mother, his brother, his brother-in-law, and the chaplain from the county jail. Defendant's brother-in-law, Jim Baker, testified that defendant previously worked in construction and was a hard worker. He described the remodeling work defendant and his father were doing together when defendant's father died. He remembered that after his father died, defendant just "shut down." Defendant's mother, Barbara Cox, described a similar breakdown after defendant's father died. Where once defendant engaged with his children, after his dad died, defendant "lost interest," and he never finished their remodeling project. She said defendant and his father were "very close," and his father's death left "a big hole in [defendant's] heart."

Cox also told the court that defendant's three children were currently in her custody. Seventy years old, Cox suffered from a "heart problem" and diabetes, and recently fractured her hip. If she were to pass away, she said, defendant's children would be put "into the system," because their mother was "nowhere to be found."

The chaplain from the county jail, Henry Quenca, also testified defendant was "suffering significantly with the loss of his father." In the time he had been meeting with defendant, he saw defendant

8

make a "dramatic transformation." According to Quenca, defendant "has always been spiritual," but after several meetings with Quenca, defendant was "more at peace." He described the transformed defendant as "[l]ess defiant," no more "chip on his shoulder," and as a man with "character."

Defendant's brother, Dean Cox, testified that defendant changed dramatically when their father died; he also offered testimony regarding defendant's prior conviction for burglary. According to Cox, defendant was Cox's tenant in the home defendant was convicted of burglarizing in 2004. Defendant was named in the rental agreement; Collette Cook, defendant's girlfriend, was added to the agreement later.

In support of his Romero motion, defendant argued his prior strike was the result of "poor lawyer work," rather than actual guilt. He also argued that his recent convictions were solely the result of his father's death, and the resulting emotional turmoil. Now, having overcome those circumstances, defendant said he could be a productive member of society, rather than a drain on the taxpayers.

The trial court was not persuaded. The court found defendant's crimes to be numerous and of increasing seriousness, with defendant's first conviction reaching all the way back to 1992. The court also found that defendant's prior strike was "not that old," particularly given that after three years in prison and two years on parole, defendant was convicted in 2009 of driving under the influence. The court thus ruled as follows: "In evaluating all of those things, I actually don't see any factors that weigh [in] favor of striking the strike. So the request to exercise discretion to strike the strike is denied."

III.   DISCUSSION

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
>   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
>   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has held that, in general, habeas relief is not available to

9

petitioners who challenge a fully-expired conviction used to enhance a subsequent sentence in a petition brought under 28 U.S.C. § 2254:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (*or because the defendant did so unsuccessfully*), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

Lackawanna County Dist. Atty. v. Coss, 532 U.S. 394, 403–04, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001) (citation omitted) (emphasis added). In Lackawanna, the Court recognized only two limited exceptions to this general rule: (1) when the alleged constitutional violation in the prior criminal proceeding concerns the failure to appoint counsel in violation of the Sixth Amendment; and (2) when the defendant was not at fault for the delay in seeking relief from the prior conviction, either because the state court refused to rule on the constitutional issue, or the defendant has, after expiration of the time for direct or collateral review of the prior conviction, obtained compelling evidence of actual innocence that could not have been uncovered in a timely manner. Id. at 404–06.

Petitioner challenges his current sentence on the grounds that his 2004 burglary conviction, which constituted a prior serious felony and added additional time to his current sentence, was constitutionally invalid. He contends he is actually innocent of his 2004 burglary conviction and thus falls within the second exception to Lackawanna. See id. at 405; West v. Ryan, 652 F.3d 1071, 1081 (9th Cir. 2011). In support, citing People v. Gauze, 15 Cal. 3d 709 (1975), petitioner argues that, under California law, a person cannot burglarize his own home and attaches a copy of his monthly rental agreement dated July 1, 2002 and a 60-day termination notice dated May 6, 2004. However, petitioner has unsuccessfully raised this same innocence claim in several state habeas petitions challenging his 2004 conviction and in his petition for review in the California Supreme Court. (ECF No. 29 at 3; ECF No. 29-2 at 54; ECF No. 29-8, at 19.) For example, in February 2005 petitioner filed a state habeas petition with the Shasta Superior Court asserting his factual innocence claim. The trial court denied that habeas petition,

10

explaining as follows:

> Petitioner alleges that he was not guilty of First Degree Residential Burglary because he was a resident of the home at the time of his alleged crime. He indicates that both his attorneys were aware of two documents, a Monthly Rental Agreement dated July 1, 2002 and a 60-Day Termination Notice Dated May 6, 2004, which, if presented to the court, would have proven his residence at the time of the burglary. Petitioner neglects to recall that upon his being booked into the Shasta County Jail, he gave authorities a different address than the one he was accused of burglarizing. Petitioner also filled out an income qualification statement for the appointment of a Public Defender in which he listed a different residence address then [sic] the one he plead guilty to burglarizing. In light of the above, it is difficult to believe Petitioner would have received a more favorable outcome absent counsel's alleged failure to present the above documents.

ECF No. 1 at 94–95.

Petitioner's contention of actual innocence fails for several reasons. First, the evidence is not new in the sense that he was unaware of his alleged status in the apartment when he invaded that apartment. In fact, he argues in this very petition that he told his attorney at the time of his burglary proceeding of his rental status.

More importantly, petitioner has misperceived the extent to which the (much distinguished) Gauze case applies to his situation. Petitioner must have had an absolute right of entry, not just an alleged possessory interest, in order for Gauze to apply. People v. Pendleton, 25 Cal. 3d 371, 382 (1979); In re Andrew I, 230 Cal. App. 3d 572, 579 (1991); People v. Frye, 18 Cal. 4th 894, 953–955 (1998), disapproved on other grounds, People v. Doolin, 45 Cal. 4th 390, 421 n.22 (2009) (Gauze did not displace previous case law that entering a residence, even with consent, with the intent to commit to commit a felony is guilty of burglary.) It is clear from the facts that petitioner's right of entry was less than unconditional. Petitioner was not residing at the residence,[1] and his ex-girlfriend was the tenant with that absolute right of entry. Petitioner does not dispute that he did not have permission to enter; indeed, most people with a permissive right to enter would use a key, and not pound on the door *ad infinitum* or finally bash the living room

---

[1] The state court's factual findings are binding in the AEDPA context unless they are unreasonable. 28 U.S.C. section 2254(d). See Harrington v. Richter, 562 U.S. 86, 131 S.Ct. 770 (2011).

window to pieces with an ax handle. Moreover, petitioner's surprise to find a new "old man" residing with his ex-girlfriend puts to rest any idea that petitioner was also residing in the apartment at the time he invaded it.

This case is identical in principle to that of People v. Ulloa, 180 Cal. App. 4th 601 (2009). In Ulloa the defendant who had been married to the victim, and whose name appeared on the lease, but was no longer residing at his wife's apartment.

> Here, there was evidence defendant and Tracy were estranged and separated due to having serious marital problems; defendant had voluntarily moved out of the apartment; defendant had committed prior domestic violence against Tracy; and Tracy feared defendant. Also, because defendant yelled at Tracy from outside the apartment at 5:00 a.m. and broke in, a reasonable inference could be drawn that defendant no longer had a key to the apartment and entered without Tracy's consent, with intent to commit theft or some other crime. Under such circumstances there was sufficient evidence supporting a finding that defendant did not have an unconditional possessory interest in the apartment. We thus conclude the apartment lease did not constitute a complete defense to burglary and there was sufficient evidence supporting defendant's burglary conviction.

Id. at 610; see also People v. Davenport, 219 Cal. App. 3d 885 (1990).

As such, petitioner does not fall within the Lackawanna exception for actual innocence because petitioner has not produced new and compelling evidence that uncovered after the time to challenge his prior conviction had expired. Lackawanna, 532 U.S. at 405.

One final reason exists why petitioner cannot attack his conviction with evidence that he was named in the lease—petitioner is barred from attacking his guilty plea for the 2004 burglary under Tollett v. Henderson, 411 U.S. 258, 267 (1973). The law is clear that petitioner may not raise claims of deprivation of his constitutional rights that occurred prior to his plea. "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." Id.; see also McMann v. Richardson, 397 U.S. 759, 770–71 (1970); Moran v. Godinez, 57 F.3d 690, 700 (9th Cir. 1994) ("As a general rule, one who voluntarily pleads guilty to a criminal charge may not subsequently seek federal habeas relief on the basis of pre-plea constitutional violations"), overruled on other

grounds by Lockyer v. Andrade, 538 U.S. 63, 75–76 (2003); Ortberg v. Moody, 961 F.2d 135, 137 (9th Cir. 1992) ("Petitioner's nolo contendere plea precludes him from challenging alleged constitutional violations that occurred prior to the entry of that plea."); Hudson v. Moran, 760 F.2d 1027, 1029–30 (9th Cir. 1985) (voluntary and intelligent guilty plea precludes federal habeas relief based upon "independent claims" of pre-plea constitutional violations); United States v. DeVaughn, 694 F.3d 1141, 1153 (10th Cir. 2012) ("A guilty plea waives all defenses except those that go to the court's subject-matter jurisdiction and the narrow class of constitutional claims involving the right not to be haled into court.").

A claim of actual innocence is a direct contradiction to a guilty plea and is therefore barred by Tollett. Sullivan v. Benedetti, 2013 WL 4432399, *6 (D.Nev.2013); Lee v. Almager, 2011 WL 2882148, *15 (C.D.Cal. Jun. 7, 2011) (barring consideration of actual innocence claim as barred by Tollett and citing Hernandez v. Mendoza-Powers, 2005 WL 2089807, at *5 (E.D.Cal. Aug. 29, 2005)); Alvarez v. Blevins, 2012 WL 3133825, *3 n. 5 (C.D.Cal. Jan. 24, 2012) (noting preclusive effect of Tollett on actual innocence claims). Petitioner asserts his trial counsel was aware that petitioner had been renting the 4448 Pensacola Street home for more than 2 years. ECF No. 1, at 11. Petitioner had to have been aware of his actual residence when he pled guilty. Nonetheless, petitioner pled guilty to burglary. ECF No. 29-12, at 27–28. As such, Tollett precludes petitioner's actual innocence claim.

Even if such a claim could be considered, the standards required to prove actual innocence set a high hurdle for this petitioner. In Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), a majority of the Supreme Court assumed, without deciding, that a freestanding claim of actual innocence is cognizable under federal law. In this regard, the court observed that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." 506 U.S. at 417. A different majority of the Supreme Court explicitly held that a freestanding claim of actual innocence is cognizable in a federal habeas proceeding. Compare 506 U.S. at 417 with 506 U.S. at 419, 430–37; see also Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir. 2000) (noting that a majority of

the Justices in Herrera would have found a freestanding claim of actual innocence).  Although the Supreme Court did not specify the standard applicable to this type of "innocence" claim, it noted that the threshold would be "extraordinarily high" and that the showing would have to be "truly persuasive."  Herrera, 506 U.S. at 417.  More recently, the Supreme Court declined to resolve whether federal courts may entertain independent claims of actual innocence but concluded that the petitioner's showing of innocence in the case before it fell short of the threshold suggested in Herrera.  House v. Bell, 547 U.S. 518, 554–551, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006).  Finally, the Supreme Court has recently once again assumed, without deciding, that a federal constitutional right to be released upon proof of "actual innocence" exists.  District Attorney's Office for Third Judicial Dist. v. Osborne, 557 U.S. 52, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009).  In doing so, the Supreme Court noted that it is an "open question" whether a freestanding claim of actual innocence exists and that the court has "struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet."  557 U.S. at 71.

The Ninth Circuit Court of Appeals has likewise assumed that freestanding innocence claims are cognizable in both capital and non-capital cases and has also articulated a minimum standard of proof in order for a habeas petitioner to prevail on such a claim.  Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).  Under that standard "[a] habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent."  Id. at 476–77; see also Jackson, 211 F.3d at 1165.  The petitioner's burden in such a case is "extraordinarily high" and requires a showing that is "truly persuasive."  Carriger, 132 F.3d at 476 (quoting Herrera, 506 U.S. at 417).

Thus, at minimum, petitioner must show that the new evidence "would be sufficient to establish by clear and convincing evidence that . . . no reasonable factfinder would have found [him] guilty of the underlying offense."  West, 652 F.3d at 1081 (internal quotations and citations omitted).  Petitioner cannot meet that burden.  As the Shasta Superior Court noted, petitioner gave authorities residence addresses different from the one he pled guilty of burglarizing.  ECF No. 1, at 95.  A reasonable factfinder could have credited petitioner's statements to authorities upon

being booked and in his application for a public defender which contradict his theory of actual innocence. The undersigned has already commented on the speciousness of petitioner's ability to claim that he had an unconditional right to enter the apartment given the way he exercised that "right." As such, petitioner's claims should be denied.

Petitioner has requested an evidentiary hearing. The holding of an evidentiary hearing in a federal habeas proceeding is futile unless the district court has first determined that the state court's adjudication of the petitioner's claims was contrary to or an unreasonable application of clearly established federal law, and therefore not entitled to deference under § 2254(d)(1), or that the state court unreasonably determined the facts based upon the record before it, and therefore deference is not warranted pursuant to § 2254(d)(2).

Here, the undersigned has already determined that the state court's decision was not contrary to or an unreasonable application of clearly established federal law based on the record before it. Nor was it an unreasonable determination of the facts. Moreover, petitioner's insistence that his asserted name on the lease absolves him from burglary is misplaced under California law. Cullen v. Pinholster, __U.S.__, 131 S.Ct. 1388 (2011), precludes an evidentiary hearing in such circumstances. Therefore, petitioner's request for an evidentiary hearing should be denied.

IV.    CONCLUSION

For all the foregoing reasons, the petition should be denied. Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitution right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.   Petitioner's application for a writ of habeas corpus be denied; and

2.  The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within fourteen days

1  after being served with these findings and recommendations, any party may file written
2  objections with the court and serve a copy on all parties.  Such a documents should be captioned
3  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
4  shall be served and filed within fourteen days after service of the objections.  Failure to file
5  objections within the specified time may waive the right to appeal the District Court's order.
6  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).
7  Dated: February 7, 2014

                /s/ Gregory G. Hollows
      UNITED STATES MAGISTRATE JUDGE

GGH:076